UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

PAUL J. ROOD,

                              Plaintiff,

    -against-                                            5:13-CV-0435 (LEK/ATB)

NEW YORK STATE TEAMSTERS
CONFERENCE PENSION AND
RETIREMENT FUND; and THE BOARD
OF TRUSTEES OF THE NEW YORK
STATE TEAMSTERS CONFERENCE
PENSION AND RETIREMENT FUND,

                              Defendants.

## MEMORANDUM-DECISION and ORDER

**I.    INTRODUCTION**

Plaintiff Paul J. Rood ("Plaintiff") commenced this action on April 19, 2013, alleging a claim for disability pension benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. Dkt. No. 1 ("Complaint"). Plaintiff's Complaint names the New York State Teamsters Conference Pension and Retirement Fund (the "Fund") and its Board of Trustees ("the Board") (collectively, "Defendants") as Defendants. Id. Presently before the Court are the parties' Motions for summary judgment. Dkt. Nos. 15 ("Defendants Motion"); 16 ("Plaintiff Motion"). For the following reasons, Defendants' Motion is denied and Plaintiff's Motion is granted.

## II. BACKGROUND[1]

### A. The Fund

The Fund is a multi-employer plan that provides pension and disability benefits to employees covered by collective bargaining agreements between contributing employers and various local unions of the International Brotherhood of Teamsters. Dkt. Nos. 15-5 ("Defendants SMF") ¶ 1; 18-1 ("Response to Defendants SMF") ¶ 1. The Fund pays pension and disability benefits to eligible participants and beneficiaries pursuant to a written pension plan. Defs. SMF ¶ 3; Resp. to Defs. SMF ¶ 3; Dkt. No. 15-8 Ex. 2 (the "Plan").

### B. Disability Benefits Under the Plan

Under the Plan, a participant who becomes "disabled" is eligible for a disability benefit ("Fund Disability Benefit" or "FDB") if he has earned ten years of Future Service Credit. Plan § 7.03(a); Defs. SMF ¶ 7; Resp. to Defs. SMF ¶ 7. A participant is considered "disabled" if he satisfies the requirements for a Social Security disability award. Plan § 2.15; Defs. SMF ¶ 8; Resp. to Defs. SMF ¶ 8. The participant's disability benefit ends when the participant reaches normal retirement age under the Plan. Plan § 7.03(b); Defs. SMF ¶ 9; Resp. to Defs. SMF ¶ 9.

The monthly Fund Disability Benefit amount is equal to the normal pension benefit the participant would be entitled to if he had attained the age requirement for a normal pension. Plan § 7.03(c); Defs. SMF ¶ 11; Resp. to Defs. SMF ¶ 11. However, the Plan further provides that, if a

---

[1] Ordinarily, on a motion for summary judgment, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). Where both parties have moved for summary judgment, it may thus be necessary to distinguish their factual assertions accordingly. See id. However, in this case, the facts are, in large part, not in dispute, and therefore the Court has consolidated the parties' factual statements for purposes of this section.

participant is also receiving workers' compensation ("WC") benefits due to an occupational disability, the monthly amount of the Fund Disability Benefit will be reduced by the amount of monthly WC benefits received. Plan § 7.03(i); Defs. SMF ¶¶ 12-13; Resp. to Defs. SMF ¶¶ 12-13. But if part of the participant's WC benefit is "used to offset other payment sources (i.e., Social Security disability awards, long-term disability, etc.)" to which the participant may be entitled, that portion of the WC benefit is not included in the reduction of the participant's monthly Fund Disability Benefit. Plan § 7.03(i); Defs. SMF ¶¶ 14-16; Resp. to Defs. SMF ¶¶ 14-16.

### C. Workers' Compensation Medicare Set-Aside Arrangements

Medicare is a federally funded program that covers health care costs for certain individuals, including those who have received Social Security disability benefits for at least twenty-four months. See 42 U.S.C. § 1395c. Medicare Parts A and B provide hospital and medical care benefits to individuals by making payments on their behalf directly to health care providers, or, in some cases, to individual beneficiaries. See generally 42 U.S.C. §§ 1395c, 1395d, 1395g, 1395j-1395k.

In 1980, Congress passed the Medicare Secondary Payer Act ("MSPA"), 42 U.S.C. § 1395y. "In certain circumstances, the MSPA makes Medicare the 'secondary payer' in relation to certain other sources, which are considered 'primary payers.'" Meek-Horton v. Trover Solutions, Inc., 915 F. Supp. 2d 486, 488 (S.D.N.Y. 2013) (citing 42 U.S.C. § 1395y(b)(2)(A)). For instance, under the MSPA, Medicare is prohibited from making a payment for a Medicare enrollee's medical benefits if "payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan of the United States or a State . . . ." 42 U.S.C. § 1395y(b)(2)(A); see also 42 C.F.R. § 411.46 ("If a lump-sum [WC] award stipulates that the amount paid is intended to

3

compensate the individual for all future medical expenses required because of the work-related injury or disease, Medicare payments for such services are excluded until medical expenses related to the injury or disease equal the amount of the lump-sum payment."). Consequently, when Medicare makes a payment for medical expenses that are covered by a WC award, the Medicare payment is merely conditional, and Medicare is entitled to reimbursement. 42 U.S.C. § 1395y(b)(2)(B). If reimbursement is not made, the MSPA authorizes the federal government to bring an action for damages against the primary payer, or against entities that receive primary payments, including the individual Medicare beneficiary. 42 U.S.C. § 1395y(b)(2)(B)(ii)-(iii); 42 C.F.R. § 411.24(e), (g).

Accordingly, when settling a WC claim, the parties may designate and identify the portion of the settlement amount that is intended to pay for future work-injury-related medical expenses that are covered and otherwise reimbursable by Medicare. CENTERS FOR MEDICARE & MEDICAID SERVICES, WORKERS' COMPENSATION MEDICARE SET-ASIDE ARRANGEMENT (WCMSA) REFERENCE GUIDE § 3.0 (Feb. 3, 2014). This designated amount is known as a Workers' Compensation Medicare Set-Aside ("WCMSA" or "MSA"). Id. "The goal of establishing a WCMSA is to estimate, as accurately as possible, the total cost that will be incurred for all medical expenses otherwise reimbursable by Medicare for work-related conditions during the course of the claimant's life, and to set aside sufficient funds from the settlement, judgment, or award to cover that cost."[2] Id.

---

[2] The Centers for Medicare and Medicaid Services ("CMS") provide a process for submitting a WCMSA arrangement for approval. CMS, WCMSA REFERENCE GUIDE §§ 7.0-9.0. Although approval is not required, it provides certainty as to the amount of funds that must be appropriately exhausted before Medicare becomes the primary payer. Id. § 4.1. "If the parties to a WC settlement stipulate a WCMSA but do not receive CMS approval, then CMS is not bound by

4

**D. Plaintiff's Benefits Claim**

Plaintiff was an employee of a contributing employer of the Fund. Defs. SMF ¶ 4; Resp. to Defs. SMF ¶ 4. On or about October 5, 2009, Plaintiff suffered an injury while on the job. Defs. SMF ¶ 5; Resp. to Defs. SMF ¶ 5. Plaintiff completed an application for a Temporary Disability Benefit under the Plan on or about August 12, 2010. Dkt. Nos. 16-1 ("Plaintiff SMF") ¶ 18; 17-1 ("Response to Plaintiff SMF") ¶ 18. Plaintiff was awarded Social Security Disability Insurance benefits ("SSDI") on August 30, 2010. Pl. SMF ¶ 19; Resp. to Pl. SMF ¶ 19. On October 1, 2010, the Board approved a Temporary Disability Benefit for Plaintiff effective May 1, 2010. Pl. SMF ¶ 20; Resp. to Pl. SMF ¶ 20. The Board's calculation of Plaintiff's Fund Disability Benefit included an offset for monthly WC payments Plaintiff was receiving. Pl. SMF ¶ 21; Resp. to Pl. SMF ¶ 21. On May 1, 2011, the Plan recalculated Plaintiff's Fund Disability Benefit to reflect the fact that Plaintiff's SSDI benefits were being reduced to offset his WC payments.[3] Pl. SMF ¶ 22; Resp. to Pl. SMF ¶ 22.

In October 2011, Plaintiff settled his WC claim with Liberty Mutual, his employer's WC insurance carrier. Pl. SMF ¶ 24; Defs. SMF ¶ 22; Dkt. No. 1-3 ("WC Settlement Agreement"). The WC Settlement Agreement provided for a total payment of $214,285, including $12,000 in

---

the set-aside amount stipulated by the parties, and it may refuse to pay for future medical expenses in the case, even if they would ordinarily have been covered by Medicare." Id. § 8.0. However, CMS only reviews WCMSAs above a certain monetary threshold. Id. § 8.1. In this case, Plaintiff's WCMSA did not meet the threshold, and therefore was not submitted for review. See Dkt. No. 1-3 at 4.

[3] Federal regulations require the Social Security Administration to partially reduce an SSDI recipient's SSDI benefits when the recipient also receives WC payments. 20 C.F.R. § 404.408; see also SOCIAL SECURITY ADMINISTRATION, HOW WORKERS' COMPENSATION AND OTHER DISABILITY PAYMENTS MAY AFFECT YOUR BENEFITS (2011), available at http://www.ssa.gov/pubs/EN-05-10018.pdf.

attorney's fees and $120,000 paid to Plaintiff up front. WC Settlement Agreement ¶ 2. The remainder of the settlement payment was devoted to a WCMSA, including $18,535 in seed money and an annuity paid out in annual contributions of $4,910, with an expected payout of $146,216.06. Id. The WC Settlement Agreement stipulated that the MSA sum "is allocated for the claimant's future related medical expenses in recognition of Medicare interest," and "is intended directly for payment of future Medicare covered medical expenses and related prescription medication." Id. ¶ 8. The New York State Workers' Compensation Board approved the WC Settlement Agreement on or about January 31, 2012. Defs. SMF ¶ 23; Resp. to Defs. SMF ¶ 23.

On May 7, 2012, the Fund notified Plaintiff that it had recalculated his Fund Disability Benefit based on the WC Settlement Agreement. Defs. SMF ¶ 24; Resp. to Defs. SMF ¶ 24. The Fund subtracted the $12,000 in attorney's fees from the total payment of $214,285, and reduced Plaintiff's Fund Disability Benefit by this sum of $202,285.00. Defs. SMF ¶ 24; Resp. to Defs. SMF ¶ 24. Pursuant to Plan rules, this sum was divided by 140—the number of months from the settlement date through the month Plaintiff would attain age 65—yielding a monthly offset of $1,444.89. Defs. SMF ¶ 24; Resp. to Defs. SMF ¶ 24.

In May 2012, Plaintiff wrote a letter to the Fund disputing the recalculation of his benefits and requesting that the portion of the WC lump sum settlement allocated to the MSA not be included in the offset. Pl. SMF ¶ 34; Defs. SMF ¶ 30. The Fund treated the letter as a "claim for benefits" under the Fund's claims and appeals procedure and proceeded to deny Plaintiff's claim on May 14, 2012. Pl. SMF ¶ 35; Defs. SMF ¶ 31. Plaintiff appealed the May 14 denial, arguing that the offset calculation should not include the MSA funds because those funds are segregated and not otherwise available to him. Pl. SMF ¶ 38; Defs. SMF ¶¶ 32-33; Compl., Ex. I. The Board denied

6

Plaintiff's appeal on June 4, 2012, stating that Plan § 7.03(i) does not provide for exclusion of the MSA funds from the WC reduction. Pl. SMF ¶ 40; Defs. SMF ¶¶ 35-37; Compl. Ex. J.

### E. Procedural History

Plaintiff commenced this action on April 19, 2013, asserting a claim for benefits under ERISA § 502(a)(1)(B). Compl. Plaintiff seeks an order compelling the Plan to exclude the MSA funds from the WC reduction to his Fund Disability Benefit, and to pay him properly calculated benefits plus interest, costs, and attorney's fees. Id. at 6-7. The parties filed their Motions on August 30, 2013. Pl. Mot.; Defs. Mot.

## III. SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(a) instructs a court to grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Although "[f]actual disputes that are irrelevant or unnecessary" will not preclude summary judgment, "summary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Taggart v. Time, Inc., 924 F.2d 43, 46 (2d Cir. 1991).

The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party claims will demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the non-moving party will bear the burden of proof on a specific issue at trial, the moving party may satisfy its own initial burden by demonstrating the absence of evidence in support of an essential element of the non-moving party's claim. Id. If the moving party carries its initial burden, then the non-moving party bears the burden of demonstrating a genuine issue of material

fact. Id. This requires the nonmoving party to do "more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Corp., 475 U.S. 574, 586 (1986). At the same time, a court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 742 (2d Cir. 1998). A court's duty in reviewing a motion for summary judgment is "carefully limited" to finding genuine disputes of fact, "not to deciding them." Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

## IV. ERISA STANDARD OF REVIEW

"In ERISA cases, the standard for summary judgment must also be viewed in conjunction with the standard of review of administrative actions under the ERISA guidelines." Diagnostic Med. Assocs., M.D., P.C. v. Guardian Life Ins. Co. of Am., 157 F. Supp. 2d 292, 297 (S.D.N.Y. 2001).

ERISA § 502(a)(1)(B), codified at 29 U.S.C. § 1132(a)(1)(B), provides a cause of action "to recover benefits due" to a participant under the terms of a covered benefits plan. 29 U.S.C. § 1132(a)(1)(B). ERISA does not set out the appropriate standard of review for actions for benefits under § 502(a)(1)(B). Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 108-09 (1989). However, the Supreme Court has explained "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 115. When the plan confers upon the administrator discretionary authority to construe the terms of the plan, a reviewing court should examine the administrator's

decision under an abuse of discretion standard.  See Nichols v. Prudential Ins. Co. of Am., 406 F.3d 98, 108 (2d Cir. 2005).  Under such a standard, an administrator abuses its discretion only when the administrator's actions are arbitrary and capricious.  McCauley v. First Unum Life Ins. Co., 551 F.3d 126, 132 (2d Cir. 2008).  A denial of a claim is arbitrary and capricious if "there has been a clear error of judgment."  Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995).

Since this is a highly deferential standard of review, a court "may overturn an administrator's decision to deny ERISA benefits only if it was without reason, unsupported by substantial evidence or erroneous as a matter of law."  Hobson v. Metro. Life Ins. Co., 574 F.3d 75, 83-84 (2d Cir. 2009).  Applying a deferential standard of review to the administrator's decision does not mean the administrator will prevail on the merits.  Conkright v. Frommert, 559 U.S. 506, 521 (2010).  It means only that the administrator's interpretation of the plan "will not be disturbed if reasonable."  Id. (quoting Firestone, 489 U.S. at 111).

A district court's review under the arbitrary and capricious standard is limited to the administrative record.  Zervos v. Verizon N.Y., Inc., 277 F.3d 635, 646 (2d Cir. 2002); Magin v. Cellco P'ship, 661 F. Supp. 2d 206, 213 (N.D.N.Y. 2009); Fredericks v. Hartford Life Ins. Co., No. 05–CV–1344, 2009 WL 174952, at *9 (N.D.N.Y. Jan. 23, 2009).  The administrative record must be viewed as a whole in deciding whether the administrator's decision was without reason, unsupported by substantial evidence, or erroneous as a matter of law.  See, e.g., Cohen v. Metro. Life Ins. Co., 485 F. Supp. 2d 339, 354 (S.D.N.Y. 2007) (considering "entire administrative record" and determining as a matter of law that defendant's invocation of exclusion was arbitrary and capricious).

Under both the *de novo* and arbitrary and capricious standards of review, an administrator's conflict of interest may affect how a court reviews the benefits determination. In Metro. Life Ins. Co. v. Glenn, the Supreme Court held that an administrator who "both evaluates claims for benefits and pays benefits claims" is conflicted. 554 U.S. 105, 112 (2008). Such a conflict of interest should be weighed as a factor in a district court's analysis, but the factor's weight depends on the circumstances. Id. at 117. In other words, "[a] plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of several different considerations that judges must take into account when reviewing the lawfulness of benefit denials." Hobson, 574 F.3d at 82-83 (internal quotations omitted) (citing McCauley, 551 F.3d at 133).

In this case, the Plan provides that the Board "shall have the exclusive right to interpret the Plan and to decide any matters arising thereunder in connection with the administration of the Plan." Plan § 9.03; Defs. SMF ¶ 39; Resp. to Defs. SMF ¶ 39. Because the Plan therefore assigns discretionary authority to determine eligibility for benefits or to construe the terms of the Plan to the Board, the arbitrary and capricious standard of review applies to Plaintiff's claim for benefits. See Nichols, 406 F.3d at 108.

However, the Court is also aware that the Board acts as both the administrator and sponsor of the Plan. Pl. SMF ¶ 4. The Board is therefore "conflicted" under Glenn, and the Court must consider this conflict as one factor in evaluating Plaintiff's claim.[4]

---

[4] Plaintiff argues extensively that the implementation of a Rehabilitation Plan due to the Plan's critical financial status justifies affording the structural conflict of interest significant weight. Pl. Mem. at 4-8; Pl. SMF ¶¶ 8-17. Defendants counter that little or no weight should be given to the conflict because Plaintiff has not offered evidence that the Plan's critical status actually affected the disposition of Plaintiff's claim. Dkt No. 17 at 4-5. Because, as explained *infra*, Defendants' interpretation of the Plan was unreasonable and therefore arbitrary and capricious, the Court need not decide whether a Plan's critical status requires affording a structural conflict of interest

**V.      MERITS**

Plaintiff argues that the plain meaning of the Plan language expressly contradicts the Board's decision to include the MSA funds in the WC reduction of his Fund Disability Benefit. See Dkt. No. 16-3 ("Plaintiff Memorandum") at 14. Defendants argue that the relevant Plan language is ambiguous, and that deference must be given to the Board's interpretation because it is reasonable. See Dkt. No. 15-1 ("Defendants Memorandum") at 11-14.

A claim for benefits under ERISA is the assertion of a contractual right. See Feifer v. Prudential Ins. Co. of Am., 306 F.3d 1202, 1210 (2d Cir. 2002). When interpreting an ERISA plan, courts apply the federal common law of contract, embodied by the "familiar rules of contract interpretation," which are in turn "informed by state [contract] law principles." Lifson v. INA Life Ins. Co. of N.Y., 333 F.3d 349, 352-53 (2d Cir. 2003). Accordingly, a court deciding a claim for benefits under ERISA must view the relevant benefits plan as a whole and strive to give its terms their plain meanings. Fay, 287 F.3d at 104.

> Here, the relevant language states that
>
> a Participant who, due to an occupational disability, is receiving compensation benefits under State or Federal compensation laws, has received a lump sum award for his compensable disability . . . shall receive the maximum monthly pension . . . less the amount of any monthly compensation benefits he may be receiving for permanent or temporary disability under such worker's compensation laws or less such equitable sum as may be determined in the event he has received a lump sum award . . . *unless such amounts also are used to offset other payment sources (i.e., Social Security disability awards, long-term disability, etc.) for which he may be entitled*.

Plan § 7.03(i) (emphasis added). The Court finds that the MSA funds constitute an amount of Plaintiff's WC award used to offset another payment source, Medicare. Although MSA funds are

---

significant weight under Glenn.

11

not explicitly mentioned in the Plan, Medicare is a "source" of "payment" for medical expenses to which an individual is "entitled." See, e.g., 42 U.S.C. § 1395d(a) ("The benefits provided to an individual by [Medicare Part A] shall consist of entitlement to have payment made on his behalf or . . . to him" for hospital and home health services.); id. § 1395k(a)(1) (describing an individual's Medicare Part B benefits as consisting of "entitlement to have payment made to him or on his behalf . . . for medical and other health services"). Under the MSPA, an individual's entitlement to Medicare payments is "offset"[5] by WC payments. See 42 U.S.C. § 1395y(b)(2)(A)(ii); see also CMS, WCMSA REFERENCE GUIDE § 3.0 ("A [WCMSA] allocates a portion of the WC settlement for all future work-injury-related medical expenses that are covered *and otherwise reimbursable by Medicare*." (emphasis added)). Accordingly, under the plain meaning of the Plan's language, the amount of Plaintiff's WC award allocated to the MSA should not be considered in reducing his Fund Disability Benefit due to his receipt of WC.

Citing the principle that "plan language is ambiguous when 'it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire agreement,'" Defendants assert that the words "other payment source" are ambiguous. Dkt. No. 17 ("Defendants Response") at 6 (quoting Fay, 287 F. 3d at 104 (alterations omitted)). Defendants have proffered various explanations for why their interpretation is correct. However, none of them render their interpretation reasonable.

First, Defendants assert that the MSA funds are "qualitatively different" from SSDI and long-term disability ("LTD") payments, which the Plan identifies as examples of "other payment

---

[5] To "offset" means to "balance or calculate against," or to "compensate for." BLACK'S LAW DICTIONARY 1195 (9th ed. 2009).

12

sources" excepted from the WC reduction. Dkt. No. 19 ("Defendants Reply") at 2; see also Defs. Mem. at 12; Defs. Resp. at 6-7. According to Defendants, "SSDI and LTD payments are separate incomes [sic] sources for a participant that can be reduced by operation of Social Security or LTD plan rules when a participant also receives worker's compensation." Defs. Reply at 2. However, "MSA funds, unlike SSDI payments, were not intended to be a separate income source for [Plaintiff]." Defs. Mem. at 12; see also Defs. Resp. at 7 (arguing that because the MSA funds are not "in the nature of income replacement" they are "contextually different from the two examples of 'other payment sources' that are referenced in the Plan").

Defendants have not adequately explained why this distinction between the purposes of Medicare and SSDI matters under the terms of the Plan. The Plan mentions only "other payment sources"; it does not say other payment sources in the nature of income replacement. And Defendants have not identified any other portion of the Plan suggesting that "other payment sources" has a narrower meaning. Although Plan § 7.03(i) parenthetically identifies SSDI and LTD as examples of "other payment sources," these examples are followed by "etc.," clearly indicating that SSDI and LTD are not the only benefits that might constitute "other payment sources." Moreover, Defendants have not identified any payment sources, other than SSDI and LTD, that would constitute exceptions to the reduction, suggesting that Defendants' interpretation, if correct, might render the word "etc." superfluous. "Where the trustees of a plan . . . interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." Frommert v. Conkright, 738 F.3d 522, 529-30 (2d Cir. 2013). Defendants have failed to explain why the differing functions of Medicare and SSDI/LTD require construing Plan § 7.03(i) contrary to the

13

plain meaning of its terms, and their interpretation is therefore not entitled to deference.

Second, Defendants attempt to justify their interpretation as consistent with the Plan's "inherent logic of treating similarly situated disability participants the same way." Defs. Mem. at 12. According to Defendants, the purpose of Plan § 7.03(i) is to ensure that participants who are injured on the job receive the same amount of total disability compensation, i.e., ((FDB – WC) + WC), as participants who are injured off the job, (FDB). Defs. Mem. at 11. The provision of § 7.03(i) excepting "other payment sources" from the WC reduction furthers this purpose. Id. at 11-12. If a participant is injured on the job and receives a WC award that partially offsets his SSDI benefits, § 7.03(i) ensures that he will receive the same total compensation, ((FDB – (WC – SSDI offset)) + WC + (SSDI – SSDI offset)), as a similarly situated participant who was injured off the job, (FDB + SSDI). Id. at 12.

Defendants claim that their treatment of Plaintiff's MSA funds is consistent with this logic, asserting that the Board "put [Plaintiff] in exactly the same economic position as a similarly situated person who did not have an MSA account as part of his/her workers compensation settlement." Defs. Mem. at 13. However, because Defendants assert that the relevant policy underlying the Plan is the intention to treat participants injured on the job the same as those injured off the job, a more probative comparison is one between Plaintiff's situation and that of an individual injured off the job.[6] An individual injured off the job would receive a Fund Disability Benefit, plus SSDI. Additionally, the participant might receive Medicare benefits for medical expenses related to the injury, assuming Medicare remains the primary payer. Therefore, total benefits would equal the

---

[6] Furthermore, as explained *infra*, Defendants' assertion that their interpretation treats Plaintiff the same as a similarly situated participant who receives a WC award without an MSA is misleading.

14

Fund Disability Benefits, plus SSDI, plus Medicare, (FDB + SSDI + Medicare).

In Plaintiff's case, under Defendants' interpretation, he receives smaller amounts of both Fund Disability Benefits and SSDI, because both are offset by the WC award. Although Plaintiff also receives WC payments, these payments do not make up the difference, because Plaintiff only has direct access to the non-MSA portion of his WC award. Dkt. No. 18 ("Plaintiff Response") at 17. The remaining funds are restricted, and Plaintiff cannot receive Medicare payments for his injury until he exhausts the MSA funds. Id. Accordingly, under Defendants' interpretation, Plaintiff's total benefits are equal to: (((FDB – (WC – SSDI offset)) + (WC – MSA) + (SSDI – SSDI offset) + MSA)), which equals (FDB + SSDI). In other words, the similarly situated individual injured off the job receives benefits equal to Plaintiff's total benefits, plus Medicare benefits. Plaintiff does not receive Medicare benefits for his injury until he exhausts the MSA portion of his WC award; Plaintiff's Medicare benefits are partially offset by his WC award, but the Fund's interpretation fails to account for that offset in calculating Plaintiff's Fund Disability Benefits.

Interpreting the Plan based on its plain meaning would avoid this inequity. Excepting the MSA portion of Plaintiff's WC award from the WC reduction to his Fund Disability Benefit would give Plaintiff additional benefits in an amount equivalent to that portion of WC payments that he cannot access due to the MSA.

Defendants counter that this interpretation would make Plaintiff better off than a similarly situated participant injured on the job who did not receive an MSA account as part of his WC settlement. Defs. Mem. at 13. However, the only reason why a participant who receives WC would not have a portion of the WC settlement allocated to an MSA is if the participant had no expected

15

medical expenses related to the on-the-job injury.[7] Such a participant would, in all practical respects, receive the same benefits as Plaintiff: he would receive his total WC award with no restrictions, which would make up for the greater offset in Fund Disability Benefits. The total benefits would consist of: ((FDB – (WC – SSDI offset)) + (WC) + (SSDI – SSDI offset)), which equals (FDB + SSDI).[8]

Plaintiff, meanwhile, can use only part of his WC award without restriction, because the MSA portion is devoted to medical expenses otherwise reimbursable by Medicare. Under the proper interpretation of the Plan, Plaintiff's total benefits would consist of: ((FDB – (WC – (SSDI offset + MSA))) + (WC – MSA) + (SSDI – SSDI offset) + MSA), which equals (FDB + SSDI + MSA). The only additional benefit Plaintiff receives over the similarly situated individual with no MSA is the MSA funds. Those funds can only be used to cover medical expenses that Medicare would otherwise cover. See 42 C.F.R. § 411.46(d)(2) ("If the settlement agreement allocates certain amounts for specific future medical services, Medicare does not pay for those services until medical expenses related to the injury or disease equal the amount of the lump-sum settlement allocated to future medical expenses."). The reason the similarly situated individual would not receive those

---

[7] It is also possible that an individual injured on the job does not have an MSA allocation because, contrary to the admonitions of CMS, he failed to consider Medicare's interest in the WC funds at the time he settled his WC claim. See CMS, WCMSA REFERENCE GUIDE § 3.0 ("Any claimant who receives a WC settlement, judgment, or award that includes an amount for future medical expenses must take Medicare's interest with respect to future medicals into account.").

[8] Alternatively, the similar situated individual might receive less in WC, i.e., an amount equal to Plaintiff's WC award minus the MSA (WC – MSA). See Defs. Mem. at 13. Even under that hypothetical, Defendants' interpretation would render that individual better off than Plaintiff. As Defendants point out, both Plaintiff and the individual with no MSA would "have the same amount of workers compensation money in their pockets after the future medical bills are paid." Id. However, Plaintiff would have less in Fund Disability Benefits in his pocket, because the Plan would offset the MSA funds against Plaintiff's Fund Disability Benefits.

16

benefits is that, per the premise of Defendants' hypothetical, he would not have any future medical expenses related to the on-the-job injury. Moreover, whereas Plaintiff cannot receive Medicare benefits for medical expenses related to his on-the-job injury until he exhausts the MSA funds, the other individual would be able to receive Medicare coverage for *all* future medical expenses. See 42 C.F.R. § 411.46(d)(1) ("[I]f a lump-sum compromise settlement forecloses the possibility of future payment of workers' compensation benefits, medical expenses incurred after the date of the settlement are payable under Medicare."). Accordingly, interpreting § 7.03(i) based on its plain meaning ensures that similarly situated Plan participants are put in the same economic position, whether they are injured on or off the job, and whether their WC award does or does not pay for future medical expenses.[9]

## VI. REMEDIES

### A. Remand Unnecessary

If a district court reviewing a claim for benefits under ERISA concludes that the plan administrator's decision was arbitrary and capricious, the usual remedy is a remand to the administrator "with instructions to consider additional evidence[,] unless no new evidence could produce a reasonable conclusion permitting denial of the claim or remand would otherwise be a useless formality." Miller v. United Welfare Fund, 72 F.3d 1066, 1071 (2d Cir. 1995) (internal quotation marks omitted). Accordingly, "a remand of an ERISA action seeking benefits is inappropriate 'where the difficulty is not that the administrative record was incomplete but that a denial of benefits based on the record was unreasonable.'" Zervos, 277 F.3d at 648 (quoting

---

[9] In their briefs, the parties also debate whether Defendants provided Plaintiff with an adequate explanation of the reasons for denying his claim. Defs. Mem. at 14-16; Pl. Resp. at 17-19. Because the reasoning underlying the denial was erroneous, the Court need not decide this question.

17

Zuckerbrod v. Phoenix Mut. Life Ins. Co., 78 F.3d 46, 51 n.4 (2d Cir. 1996)). Here, the administrative record was complete, and the Board denied Plaintiff benefits based on an unreasonable, and therefore arbitrary and capricious, interpretation of the Plan. See Frommert v. Conkright, 738 F.3d 522, 529-30 (2d Cir. 2013). Remand is inappropriate and unnecessary, and the Court orders Defendants to award Plaintiff the benefits to which he is entitled under the Plan, consistent with this Memorandum-Decision and Order.

**B. Prejudgment Interest**

In a suit to enforce a right under ERISA, the question of whether or not to award prejudgment interest is ordinarily left to the discretion of the district court. Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 139-40 (2d Cir. 2000). "In exercising such discretion, the court is to take into consideration (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Id. at 139 (internal quotation marks omitted). "Since prejudgment interest is an element of the plaintiff's complete compensation, the same considerations that inform the court's decision whether or not to award interest at all should inform the court's choice of interest rate." Id. (internal quotation marks, citation, and alterations omitted).

Here, Plaintiff requests prejudgment interest "at a rate of 9% per annum . . . in accordance with New York State law, or any controlling provisions of federal law or the Plan." Compl. at 7. There is no applicable federal statute establishing a prejudgment interest rate, Alfano v. CIGNA Life Ins. Co. of N.Y, No. 07 CIV. 9661, 2009 WL 890626, at *7 (S.D.N.Y. Apr. 2, 2009), and the parties have not identified any relevant Plan provision. Section 5004 of the New York Civil Practice Law

18

and Rules establishes a prejudgment interest rate of 9% per annum, representing "an objective legislative judgment" that this is an appropriate rate. Alfano, 2009 WL 890626, at *7. Other district courts have utilized this statutory interest rate in awarding an ERISA claimant wrongfully denied disability benefits, see, e.g., id.; Levitian v. Sun Life & Health Ins. Co. (U.S.), No. 09 CIV. 2965, 2013 WL 3829623, at *12 (S.D.N.Y. July 24, 2013), report and recommendation adopted, No. 09 CIV. 2965, 2013 WL 4399026 (S.D.N.Y. Aug. 15, 2013), and the Court likewise finds the rate appropriate in this case.

### C. Attorney's Fees

ERISA's fee shifting statute provides that "the court in its discretion may allow a reasonable attorney's fee and costs . . . to either party." 29 U.S.C. § 1132(g)(1). "It is well-established that Congress intended the fee provisions of ERISA to encourage beneficiaries to enforce their statutory rights." Donachie v. Liberty Life Assur. Co. of Boston, 745 F.3d 41, 45-46 (2d Cir. 2014) (internal quotation marks omitted). Accordingly, "granting a prevailing plaintiff's request for fees is appropriate absent some particular justification for not doing so." Id. at 47 (internal quotation marks omitted). Here, Plaintiff has prevailed on his claim for benefits, and there is no reason to deny his request for attorney's fees. The amount of fees and costs to be awarded to Plaintiff will be determined by the Court on a separate motion to be filed within fourteen days of the date of this Memorandum-Decision and Order.

## VII. CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion (Dkt. No. 15) for summary judgment is **DENIED**; and it is further

19

**ORDERED**, that Plaintiff's Motion (Dkt. No. 16) for summary judgment is **GRANTED**; and it is further

**ORDERED**, that it is hereby **DECLARED** that the portion of Plaintiff's workers' compensation settlement award allocated as a Medicare set-aside constitutes, for the purposes of § 7.03(i) of the Plan, an amount used to offset another payment source to which Plaintiff is entitled; and it is further

**ORDERED**, that Defendants recalculate Plaintiff's disability pension benefits consistent with this Memorandum-Decision and Order, and pay Plaintiff all past due benefits plus prejudgment interest at a rate of 9% per annum; and it is further

**ORDERED**, that, pursuant to 29 U.S.C. § 1132(g), Defendants shall pay Plaintiff attorney's fees and costs in an amount to be determined by the Court at a later date. Plaintiff is ordered to file a motion concerning the amount of attorney's fees and costs for which he seeks reimbursement within **fourteen (14) days** of the filing date of this Memorandum-Decision and Order. Defendant shall have **fourteen (14) days** from the filing date of Plaintiff's motion to respond; and it is further

**ORDERED**, that the Clerk enter judgment for Plaintiff and close this case; and it is further

**ORDERED**, that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED**.

DATED: August 20, 2014
Albany, New York

_____
Lawrence E. Kahn
U.S. District Judge